1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

THE DENTISTS INSURANCE COMPANY,

Plaintiff,

v.

JOSEPH Z. YOUSEFIAN, *et al.*,

Defendants.

Case No. C20-1076RSL

ORDER ON PARTIES'
CROSS-MOTIONS FOR
SUMMARY JUDGMENT

This matter comes before the Court on defendant's "Motion for Partial Summary Judgment" (Dkt. # 57) and plaintiff's "Cross-Motion for Partial Summary Judgment" (Dkt. # 67). The Court held oral argument on both motions on May 9, 2023. *See* Dkt. # 111. The Court also considers plaintiff's "Motion to Supplement the Record" (Dkt. # 109), defendant's "Unopposed Motion to Supplement the Record" (Dkt. # 90), and the accompanying briefing, declarations, and exhibits. *See* Dkts. # 91, 110, 112-16. Having heard the parties' arguments, reviewed their submissions, and considered the remainder of the record, the Court denies plaintiff's motion for summary judgment and grants defendant's motion for partial summary judgment in part. Specifically, the Court grants defendant summary judgment on (1) his scope of coverage claim and (2) his claim of insurance bad faith with regard to plaintiff's failure to reasonably investigate defendant's claim.

## I.   Background

### A.  Basis for Defendant's Insurance Claim

1  Beginning in March 2011, defendant Joseph Yousefian, DMD, MS, leased a suite in
2  Bellevue, WA, for his orthodontics practice. Dkt. # 58 at 92. On March 23, 2020, the tenant in
3  the suite above his deliberately started a fire, causing the fire suppression system in the building
4  to be activated, which resulted in water damaging property contained within Dr. Yousefian's
5  suite. Dkt. # 1 at 2-3. At the time of the fire, Dr. Yousefian was insured under a business owner
6  policy issued by The Dentists Insurance Company ("TDIC"). *Id.* at 3. This policy provided
7  coverage for physical loss or damage to covered "Business Personal Property" – the subject of
8  the instant suit. *Id.* Under the policy, "Business Personal Property" includes "Tenant
9  Improvements," which are defined as "fixtures, alterations, installments or additions that: a) Are
10 made a part of the building or structure you occupy but do not own b) Are made or acquired at
11 your expense but that you cannot legally remove." *Id.* at 5. Dr. Yousefian immediately tendered
12 a property damage claim to TDIC, seeking insurance coverage for the damage caused by the
13 March 2020 fire. *Id.* at 3; Dkt. # 57 at 4.

14  **B. June 2020 Coverage Estimate**
15  On March 24, 2020, Robert Petty, a claims specialist at TDIC, responded to Dr.
16 Yousefian's claim, confirming that the claim was "covered" and explaining that under the
17 policy, "Business Personal Property is pretty much anything and everything in your office + the
18 cost to dry out the office and rebuild it." Dkt. # 58 at 86. Mr. Petty further noted that "[i]t may
19 be some of those costs are the responsibility of the landlord, so please provide a lease for
20 review." *Id.* On March 27, 2020, after having an attorney review the lease provided by Dr.
21 Yousefian, Mr. Petty reported that TDIC was "unable to find any language that would require
22 the landlord" to take responsibility for "water mitigation," and that the lease appeared to be
23 "fairly one-sided . . . tilting towards the landlord." *Id.* at 130.

24  On April 15, 2020, TDIC informed Dr. Yousefian that the "building owner's [insurance]
25 carrier (Hartford) has accepted responsibility for all building repairs–from water mitigation to
26 repairs in any and all suites." *Id.* at 132. TDIC explained that although Hartford was "primary,
27 we continue to be responsible for any damage to your equipment, loss of business income and
28 'extra expense' to keep your practice producing revenue to off set loss of business income." *Id.*

1   Mr. Petty's log notes reflect that on April 28, 2020, he was contacted by "Hartford claims rep

2   Bruce Torrenga who informed me their rendering of the lease is that the building owner owns all

3   the insured's improvements to the space and they would be the primary, and only, carrier to

4   effect repairs." Dkt. # 68-1 at 2.

5        On May 1, 2020, TDIC wrote to Dr. Yousefian, stating:

6            You have raised a concern as to the damage to your office and believe you
             should be compensated for repairs despite the fact Hartford Insurance is
7            rebuilding your space. You base this on my telling you that there was
             coverage for such repairs and that if you opted to not repair your office you
8            could use the money elsewhere. The rebuilding of your office space at your
             location is referred to as 'making you whole'. However, once Hartford took
9            over as primary payer and shut me out of the repairs, they are now making
             you whole as they are effecting repairs. In other words, your insurable
10           interest in repairs have been superseded by Hartford's taking primary
             responsibility for repairs. As things stand now so far as I am led to believe,
11           you have a valid lease agreement and are a legal tenant of this building.
             However, if this disposition changes please have Mr. Ross so inform me
12           and I will re-evaluate our position. It is hard for me to speculate on 'what
             ifs', but I am very willing to reconsider if things change.
13

14

15

16   Dkt. # 58 at 137.

17        On May 20, 2020, the landlord of the Insured Premises terminated Dr. Yousefian's lease,

18   invoking a clause that permitted termination in the event of damage that cannot be repaired

19   within 90 days. *Id.* at 139-40. Dr. Yousefian informed TDIC of this development. *Id.* at 142-43.

20   On June 10, 2020, after conducting a "fresh coverage review" in light of the lease termination,

21   *id.* at 142, TDIC emailed Dr. Yousefian the following:

22           Doctor, as your lease has been terminated by the owner, we believe it is
             proper to pay you for the damage to your old office space as if we were
23           repairing it. That will make you whole with respect to office repairs.
             I had anticipated this might happen some time ago, so I had Mr. Strunk
24           [Jason Strunk of Evergreen Adjustment Service, Inc.] go to the construction
             company back then and confirm the work to be done and the cost. I also did
25           as I also suspected they will not repair the space to what you had and will
             build it out differently if you did not return. I wanted to memorialize what
26           they would have done had you returned.
27

28

ORDER ON PARTIES' CROSS-MOTIONS
FOR SUMMARY JUDGMENT - 3

1
2
3
4
5

> That estimate to repair is $139,295.83 replacement cost value, and
> $120,654.28 actual cash value (or, after depreciation). Normally on a loss
> such as this we would pay the actual cash value up front and the remaining
> amount for the replacement cost value when work is completed. But as
> your lease was terminated and you have to build out a new space, we will
> be sending you a check for the full replacement cost amount, less your $500
> policy deductible, or $138,795.83.

6   *Id.* at 146. Pursuant to the estimate prepared by Evergreen Adjuster Services, Inc. ("EAS"), *see*

7   Dkt. # 58 at 149-86, TDIC paid Dr. Yousefian $138,79.83, Dkt. # 68 at 2. On the same day that

8   Mr. Petty sent the above email to Dr. Yousefian, he also sent an email to his supervisor

9   regarding Dr. Yousefian's claim, stating that he believed "the insured may reach up to $450,000

10  [Business Personal Property] . . . therefore we have reserved this claim for $1.2 million." Dkt.

11  # 86 at 5. In an internal memorandum dated the same day, Mr. Petty wrote to the same

12  supervisor: "I anticipate payouts in the following areas: BPP $450,000; LBI $650,000; EE

13  $100,000. I seek $1 million authority to settle this claim." *Id.* at 8. Neither the email nor the

14  memorandum explain or provide details as to how Mr. Petty reached the $450,000 number.

15  Dr. Yousefian believed that the $138,795.83 valuation calculated in the EAS estimate

16  was substantially below the actual repair cost for his former offices. Dkt. # 58 at 3-4.

17  Accordingly, he reached out to TDIC to express this concern. *Id.* TDIC claims that during a

18  meeting to discuss his concerns, Dr. Yousefian, through his counsel, "requested that TDIC pay

19  for a full buildout of a new office space at a different Location." Dkt. # 67 at 8 (citing Dkt. # 68-

20  3 at 2). Dr. Yousefian asserts that he "did not ever demand that TDIC" pay him based on the

21  "estimated cost" of preparing a "new permanent space for my offices," and that he "merely

22  wanted to be paid a fair and reasonable estimate of the damage to [his] prior offices." Dkt. # 10

23  at 2.

24  ### C.  The Instant Lawsuit

25  Following this disagreement over TDIC's proffered payment, TDIC filed the instant suit

26  seeking declaratory relief by way of a "determination that [TDIC] has no duty to provide any

27  further Business Personal Property coverage for tenant improvements to the Insured Premises

28  beyond the coverage that has been already provided." Dkt. # 1 at 1.

ORDER ON PARTIES' CROSS-MOTIONS
FOR SUMMARY JUDGMENT - 4

1    In its Complaint, TDIC focused on the valuation dispute, alleging that "[t]here is an

2    actual and justiciable controversy as to whether TDIC owes more than the $138,795.83 it

3    determined was the cost to repair the covered loss to Business Personal Property in the form of

4    tenant improvements to the Insured Premises under the terms and conditions of the Policy." *Id.*

5    at 7-8.

6         **D.  Appraisal**

7    On September 2, 2020, Dr. Yousefian moved to stay the litigation and compel appraisal,

8    citing the policy's clause mandating that all valuation disagreements be resolved through the

9    appraisal process. Dkt. # 9. TDIC opposed the stay, arguing in part that it was "necessary to

10   determine the scope of the covered loss and Defendants' insurable interest—i.e., the scope of

11   their Tenant Improvements to the Insured Premises—before any dispute over value of the loss

12   can be resolved." Dkt. # 14 at 9. The Court granted Dr. Yousefian's motion to stay and compel

13   appraisal, explaining "As TDIC's complaint and witnesses make clear . . . the primary issue in

14   this litigation is 'what is the value of the insureds' losses?'" Dkt. # 23 at 2.

15   Pursuant to the Court's order, both parties retained appraisers. As part of this appraisal

16   process, TDIC retained McBride Construction Resources, Inc. ("McBride") to conduct an

17   estimate of the damage. Dkt. # 25. The McBride estimate broke the repairs out into two

18   categories – "tenant improvements" and "building." Dkt. # 26. While TDIC asserted in an

19   interrogatory that it "did not instruct McBride as to how it should . . . create the repair estimate,"

20   Dkt. # 72 at 25, an email from Troy Brogdan, Vice President of McBride, to defendant's expert

21   clearly states that McBride was "tasked by [plaintiff's counsel] with parsing out the work for the

22   repairs into two categories," Dkt. # 71 at 4.

23   McBride identified property in the "tenant improvements" category based on a "review of

24   documents received by the parties through subpoena regarding the previous build-out of the

25   Insured Premises that was performed for Dr. Yousefian by Olympus Construction as the general

26   contractor in or around 2011." *Id.* at 2. In other words, the "tenant improvements" captured in

27   the McBride estimate were improvements that Dr. Yousefian personally paid for. All other

28   repairs captured in the McBride estimate were identified as "building" repairs. *Id.* McBride

ORDER ON PARTIES' CROSS-MOTIONS
FOR SUMMARY JUDGMENT - 5

1   estimated that the "tenant improvement" repairs were valued at $147,414.82, and the "building
2   repairs" were valued at $313,672.33. *Id.* at 22.

3           **E.  January 2021 Coverage Determination**

4         On January 19, 2021, TDIC sent Dr. Yousefian a letter outlining its "coverage analysis"
5   following the McBride Estimate. Dkt. # 59 at 74-80. In the letter, TDIC alleged that, "despite
6   repeated requests, Dr. Yousefian never provided any documentation or other evidence showing
7   what improvements to the insured premises he had done or what those improvements cost." *Id.*
8   at 75. TDIC asserted that it had "now received documentation showing the improvements done
9   at the insured premises when Dr. Yousefian first leased the space in 2011." *Id.* TDIC asserted
10  that it had received this documentation by subpoenaing the building owner and the general
11  contractor responsible for the improvements. *Id.* TDIC contended that it "did not possess the
12  power to subpoena third parties until this lawsuit was initiated." *Id.*

13        In its analysis of the scope of coverage, TDIC first concluded that Dr. Yousefian did not
14  have an "insurable interest beyond the improvements he added to the insured premises." *Id.* at
15  79 (citing RCW § 48.18.040 and *Gossett v. Farmers Ins. Co.*, 133 Wn. 2d 954 (1997)). TDIC
16  then asserted that, under the policy, Dr. Yousefian was covered only "for lost or damaged tenant
17  improvement property and not for any other part of the office or building structure that Dr.
18  Yousefian did not own or pay to have added to the insured premises." *Id.* at 80. Likely
19  anticipating that Dr. Yousefian would argue that this was a significant change from TDIC's June
20  2020 coverage determination, TDIC also noted that "[e]ven if TDIC's original estimate
21  inadvertently included uncovered property, estoppel could not apply here because TDIC did not
22  know and could not have known the true scope of Tenant Improvement property until it was
23  able to issue third-party subpoenas in this action." *Id.* at 79.

24        TDIC thus concluded that under its new coverage determination, defendant was only
25  entitled to the tenant improvements that he had personally paid for (specifically, the construction
26  work done by Olympus Construction in 2011). *Id.* at 80. The McBride estimate valued this work
27  at $147,414.82. *Id.* at 80. TDIC subsequently paid Dr. Yousefian an additional $8,118.99,
28

ORDER ON PARTIES' CROSS-MOTIONS
FOR SUMMARY JUDGMENT - 6

1  bringing TDIC's total payment to $147,414.82 (the amount identified as the value of the "tenant
2  improvement" category in the McBride estimate). Dkt. # 68 at 2.

3       It appears that the parties discontinued the appraisal process after Dr. Yousefian received
4  the January 2021 coverage analysis letter. *See* Dkt. # 67 at 10 (citing Dkts. # 25-6, 25-7).

5                **F.  Evidence Regarding Formulation of New Coverage Determination**

6       While defendant first received notice of plaintiff's new coverage determination from the
7  January 2021 letter, evidence suggests that TDIC began developing its current approach as early
8  as August 2020. Specifically, an internal memorandum authored by Jason Strunk of EAS states
9  that "[a]n estimate was co-written by EAS and Kustom US to address repair," but noted "[a]t
10 this time, our position is that the Insured is not owed the full amount of the repairs since he took
11 occupancy of a space that already had drywall, paint and flooring with cabinets and counter
12 spaces." Dkt. # 86 at 11-12. In the "Remarks" portion of the memorandum, Mr. Strunk notes
13 "[a]t this time, the focus of the remainder of the claim is to address the repair estimate prepared
14 by EAS and Kustom US. We will need to compare it to any invoices and receipts that the
15 Insured will provide showing what his tenant improvement contributions were made prior to
16 taking occupancy of his leased space and reevaluate if necessary or attend appraisal if required
17 by TDIC." *Id.* at 13. Mr. Strunk further listed action items for EAS, including "[p]rocure the
18 original architect layout for the office prior to Yousefian taking occupancy" and "[p]rocure
19 Yousefian's receipts to provide proof of incurred cost to justify tenant improvement." *Id.* at 12.
20 Plaintiff has also provided a copy of an email dated August 4, 2020, wherein Mr. Strunk
21 requests information from Dr. Yousefian regarding any improvements to the suite he personally
22 paid for. Dkt. # 68-4.

23      **II.    Discussion**

24      Both parties have moved for summary judgment. Defendant asks the Court to enter
25 partial summary judgment on (1) Dr. Yousefian's right to coverage for all improvements TDIC
26 identified as covered in its June 2020 coverage determination; (2) TDIC's bad faith, as well as
27 violations of the Insurance Fair Conduct Act ("IFCA") and Consumer Protection Act ("CPA");
28 and (3) Dr. Yousefian's entitlement to treble damages and attorney's fees. Dkt. # 57 at 3.

ORDER ON PARTIES' CROSS-MOTIONS
FOR SUMMARY JUDGMENT - 7

1   Plaintiff asks the Court to find that TDIC has already paid all the amounts owed under the

2   policy for tenant improvements, Dkt. # 67 at 13, and that it has committed no bad faith or

3   violations of the IFCA or CPA, *id.* at 3.

4   **A. Legal Standard**

5   A party is entitled to summary judgment if the "movant shows that there is no genuine

6   dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.

7   R. Civ. P. 56(a). Under Rule 56, the party seeking summary dismissal of the case "bears the

8   initial responsibility of informing the district court of the basis for its motion," *Celotex Corp. v.*

9   *Catrett*, 477 U.S. 317, 323 (1986), and "citing to particular parts of materials in the record" that

10  establish the absence of a genuine issue of material fact, Fed. R. Civ. P. 56(c). Once the moving

11  party satisfies its burden, it is entitled to summary judgment if the non-moving party fails to

12  designate "specific facts showing that there is a genuine issue for trial." *Celotex*, 477 U.S. at 324

13  (quoting Fed. R. Civ. P. 56(e)). The Court must "view the evidence in the light most favorable

14  to the nonmovant and draw all reasonable inferences in the nonmovant's favor." *City of Pomona*

15  *v. SQM N. Am. Corp.*, 750 F.3d 1036, 1049 (9th Cir. 2014). Although the Court must reserve

16  genuine issues regarding credibility, the weight of the evidence, and legitimate inferences for the

17  trier of fact, the "mere existence of a scintilla of evidence in support of the non-moving party's

18  position will be insufficient" to avoid judgment. *Id.* (quoting *Anderson v. Liberty Lobby, Inc.*,

19  477 U.S. 242, 252 (1986)). "Where the record taken as a whole could not lead a rational trier of

20  fact to find for the nonmoving party, there is no genuine issue for trial." *Id.* (quoting *Matsushita*

21  *Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)).

22  "[W]hen simultaneous cross-motions for summary judgment on the same claim are

23  before the court, the court must consider the appropriate evidentiary material identified and

24  submitted in support of both motions, and in opposition to both motions, before ruling on each

25  of them." *Tulalip Tribes of Wash. v. Washington*, 783 F.3d 1151, 1156 (9th Cir. 2015) (quoting

26  *Fair Hous. Council of Riverside Cnty., Inc. v. Riverside Two*, 249 F.3d 1132, 1134 (9th Cir.

27  2001)). The court "rule[s] on each party's motion on an individual and separate basis,

28  determining, for each side, whether a judgment may be entered in accordance with the Rule

ORDER ON PARTIES' CROSS-MOTIONS
FOR SUMMARY JUDGMENT - 8

1   56 standard." *Id.* (quoting 10A Charles Alan Wright, Arthur R. Miller & Mary Kay Kane,

2   Federal Practice and Procedure § 2720 (3d ed. 1998)).

3   ## B.  Admissibility of Expert Opinion

4       In support of its cross-motion for summary judgment and opposition to defendant's

5   partial motion for summary judgment, plaintiff submits a declaration from "claims handling

6   expert" Jerry Hartmann. Dkt. # 69. Plaintiff cites to the declaration throughout its motion as

7   evidence for its position. *See* Dkt. # 67 at 10, 13, 14, 17, 18, 20, 21, 22. Defendant argues that

8   Mr. Hartmann's opinion is inadmissible and asks the Court to strike the declaration on the basis

9   that his opinions are "entirely unsupported and entirely unhelpful." Dkt. # 70 at 13. Before

10  addressing the merits of the parties' motions for summary judgment, the Court addresses the

11  admissibility of the expert declaration.

12      "As a preliminary matter . . . expert opinion is admissible and may defeat summary

13  judgment if it appears that the affiant is competent to give an expert opinion and that the factual

14  basis for the opinion is stated in the affidavit, even though the underlying factual details and

15  reasoning upon which the opinion is based are not." *Rebel Oil Co. v. Atlantic Richfield Co.*, 51

16  F.3d 1421, 1435 (9th Cir. 1995). However, "[a] district court may disregard an expert's opinion

17  offered in opposition to summary judgment if the opinion is legally insufficient to create a

18  material issue of fact for trial." *Kauffman v. Manchester Tank & Equip. Co.*, 203 F.3d 831, 832

19  (9th Cir. 1999). The opinion may be insufficient where it "is not supported by sufficient facts to

20  validate it in the eyes of the law, or when indisputable record facts contradict or otherwise

21  render the opinion unreasonable." *Rebel Oil*, 51 F.3d at 1436; *see also Bulthuis v. Rexall Corp.*,

22  789 F.2d 1315, 1318 (9th Cir. 1985) (per curiam). "[I]n order to defeat summary judgment, the

23  inferences drawn from the expert's affidavit must fulfill the standard in *Anderson v. Liberty*

24  *Lobby, Inc.*, 477 U.S. 242, 249–52 (1986) of being sufficient to sustain a favorable jury verdict."

25  *Tr. Co. for USL v. Wein Air Alaska, Inc.*, 114 F.3d 1196, 1196 (9th Cir. 1997).

26      Additionally, a "district court may exclude expert testimony entirely if it fails to meet the

27  standards of Federal Rule of Evidence 702 and *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S.

28  579 (1993)." *Kauffman*, 203 F.3d at 831 n.1; *Samuels v. Holland Am. Line-USA Inc.*, 656 F.3d

ORDER ON PARTIES' CROSS-MOTIONS
FOR SUMMARY JUDGMENT - 9

948, 952-53 (9th Cir. 2011). To be admissible under *Daubert* and Rule 702, "expert testimony must be both reliable and helpful. The reliability of expert testimony is judged not on the substance of the opinions offered, but on the methods employed in developing those opinions." *Avocent Redmond Corp. v. Rose Elecs.*, No. C06-1711-RSL, 2013 WL 12121578, at *1 (W.D. Wash. Mar. 8, 2013) (citing *Daubert*, 509 U.S. at 594-95); *see also* Fed. R. Evid. 702 (explaining that expert testimony is admissible "[i]f scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue"). The Court has a "duty to act as gatekeeper and to assure the reliability of proffered expert testimony before admitting it applies to all (not just scientific) expert testimony." *United States v. Hermanek*, 289 F.3d 1076, 1093 (9th Cir. 2002) (citing *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 147 (1999)).

Here, Mr. Hartmann's declaration establishes that he has several decades of experience working in the insurance industry, *see* Dkt. # 69-1, and lists the documents he considered in forming his opinion, *see* Dkt. # 69 at 2. The substance of his declaration includes the following seven opinions:

> 4. In my opinion, the subject policy of insurance issued by TDIC (the "TDIC Policy") operates solely to provide coverage for damage to covered tenant improvements.
> 5. In my opinion, TDIC's interpretation of all terms and conditions of the TDIC Policy was correct.
> 6. In my opinion, TDIC's initial analysis of the subject claims and amounts owed were consistent with the information available at the time.
> 7. In my opinion, TDIC was consistent in its representations to Defendants as to how the TDIC Policy works and what Defendants would be entitled to recover.
> 8. In my opinion, TDIC paid all amounts owed under the TDIC Policy for tenant improvements.
> 9. In my opinion, TDIC's conduct was consistent with industry custom and standard for the handling of insurance claims in the State of Washington at all material times regarding Defendants' claims.
> 10. In my opinion, TDIC acted reasonably and in good faith at all material times regarding Defendants' claims.

*Id.* at 2-3.

ORDER ON PARTIES' CROSS-MOTIONS
FOR SUMMARY JUDGMENT - 10

1    Defendant argues that "[t]hese opinions are plainly inadmissible because Mr. Hartmann

2    provides not a single word of analysis of relevant evidence," nor does he "identify a single

3    industry standard" or explain how TDIC's conduct conformed to that industry standard. Dkt.

4    # 70 at 12-13. He further argues that Mr. Hartmann's opinions interpreting the policy language

5    are "*per se* inadmissible because they are legal conclusions." Dkt. # 89-1 at 9. Plaintiff's

6    response to defendant's arguments appear to be: (1) the deadline for expert disclosures had not

7    yet passed when the declaration was submitted; (2) the bare assertion that Mr. Hartmann's

8    "preliminary expert opinion[]" is "admissible and consistent with the experts' final opinions and

9    supported by the facts and circumstances giving rise to this matter"; and (3) "the information

10   required to establish Mr. Hartmann as a qualified expert witness is included his Declaration."

11   Dkt. # 78 at 10. Plaintiff's arguments are unavailing. While the deadline for expert disclosures

12   had not passed at the time plaintiff filed its cross-motion for summary judgment, the Court may

13   disregard or strike an expert opinion at the summary judgment stage for the reasons described

14   above. Additionally, defendant does not challenge the admissibility of Mr. Hartmann's opinions

15   on the grounds that he is unqualified, but on the grounds that his opinions are unhelpful and

16   unsupported.

17   Turning to the substance of Mr. Hartmann's opinions, "an expert witness cannot give an

18   opinion as to her legal conclusion, i.e., an opinion on an ultimate issue of law." *Nationwide*

19   *Transp. Fin. v. Cass Info. Sys., Inc.*, 523 F.3d 1051, 1058 (9th Cir. 2008) (internal quotation

20   marks and citations omitted). Among the subjects to which an expert may not testify is the legal

21   meaning or interpretation of a contract. *See McHugh v. United States Service Auto Ass'n*, 164 F.

22   3d 451, 454 (9th Cir. 1999) (stating expert "testimony cannot be used to provide legal meaning

23   or interpret the [insurance] policies as written").

24   Referencing this rule, "numerous courts in this district have prohibited expert witnesses

25   from opining on the reasonableness of an insurer's actions with respect to an insured's claim."

26   *Allstate Indem. Co. v. Lindquist*, No. C20-1508JLR, 2022 WL 2192868, at *3 (W.D. Wash. June

27   17, 2022) (internal quotation marks omitted) (collecting cases). Thus, an expert witness "can

28   discuss the industry standards and whether [the insurer's] actions conformed with those

ORDER ON PARTIES' CROSS-MOTIONS
FOR SUMMARY JUDGMENT - 11

1   standards, but it will be left to the jury to determine whether [the insurer] acted reasonably." *Liu*

2   *v. State Farm Mut. Auto. Ins. Co.*, No. C18-1862-BJR, 2021 WL 717540, at \*4 (W.D. Wash.

3   Feb. 24, 2021); see also *Ledcor Indus. (USA) Inc. v. Va. Sur. Co.*, No. C09-1807-RSM, 2012

4   WL 254251, at \*2 (W.D. Wash. Jan. 26, 2012) ("While an expert witness may testify that an

5   insurer deviated from industry standards on the issue of bad faith, he may not reach an actual

6   legal conclusion that the insurer did so.") (citing *Hangarter v. Provident Life & Acc. Ins. Co.*,

7   373 F.3d 998, 1016 (9th Cir. 2004))).

8          Here, Mr. Hartmann's opinions in paragraphs four and ten violate this rule, as they offer

9   interpretation of the policy language and the conclusion that "TDIC acted reasonably and in

10   good faith." Dkt. # 69 at ¶¶ 4, 10. The Court accordingly strikes this testimony.

11          The Court finds Mr. Hartmann's remaining opinions too conclusory to be helpful. For

12   example, Mr. Hartmann states that he believes "TDIC's conduct was consistent with industry

13   custom and standard," but fails to identify what the "industry custom and standard" is, or how

14   TDIC conformed to it. Dkt. # 69 at ¶ 9. Additionally, several of Mr. Hartmann's opinions appear

15   to be contradicted or rendered unreasonable by "indisputable record facts." *Rebel Oil*, 51 F.3d at

16   1436. For example, Mr. Hartmann states that, in his opinion, "TDIC was consistent in its

17   representations to Defendants as to how the TDIC Policy works and what Defendants would be

18   entitled to recover." Dkt. # 69 at ¶ 7. However, the record establishes that TDIC's initial

19   estimate of the repairs covered by the policy (prepared by EAS) included many repairs that

20   TDIC later insisted were *not* covered in its subsequent repairs estimate (prepared by McBride).

21   Dkt. # 72 at 28. Because the Court finds Mr. Hartmann's opinions meet neither the helpfulness

22   nor the reliability requirements of expert testimony, paragraphs five through nine of his

23   declaration are also stricken.

24                      **C.  Motions to Supplement the Record**

25

26

27

28

ORDER ON PARTIES' CROSS-MOTIONS
FOR SUMMARY JUDGMENT - 12

Both parties have moved to supplement the record. *See* Dkt. # 109; Dkt. # 112.[1] While the parties do not identify a Federal Rule of Civil Procedure under which they bring their requests, *see* Dkt. # 109, courts have generally considered motions to supplement the record on summary judgment under both Rule 56(f) and Rule 56(e), *see Nakanelua v. United Pub. Workers, AFSCME, Loc. 646, AFL-CIO*, No. C20-442JAO-KJM, 2022 WL 174098, at *2 (D. Haw. Jan. 19, 2022). Additionally, district courts have "discretion to permit parties to submit supplemental materials in support of or in opposition to a motion for summary judgment." *Agua Caliente Band of Cahuilla Indians v. Coachella Valley Water Dist.*, Case No. C13-883JGB, 2018 WL 6190348, at *3 (C.D. Cal. Aug. 1, 2018) (citing *Savage v. Dennis Dillon Auto Park & Truck Ctr., Inc.*, Case No. C14-123EJL-CWD, 2015 WL 6134354, at *2 (D. Idaho Oct. 19, 2015)). The critical inquiry in determining whether to grant a motion to supplement is the diligence of the party making the request. *See Stucky v. Dep't of Educ.*, 337 F. App'x 611, 613 (9th Cir. 2009).

Plaintiff seeks to supplement the record with deposition testimony from one of TDIC's Rule 30(b)(6) representatives, Angela Rutherford. Dkt. # 109. In her deposition, Ms. Rutherford states that (1) Dr. Yousefian's $400,000 business personal property policy "represents equipment and improvements that Dr. Yousefian added to the suite"; (2) that the policy "does not include improvements that were already at the suite when [Dr. Yousefian] began his tenancy"; (3) that the $400,000 figure "would have been based off a phone conversation with the insured directly"; and (4) that TDIC's predecessor would have determined the value of Dr. Yousefian's equipment through a "conversation with the insured." *Id.* at 3-4 (citing Dkt. # 110-4 at 3-5). TDIC argues that this testimony "establishes that the Business Personal Property (BPP) premium for the Policy was based on the amount of money that Dr. Yousefian intended to put

---

[1] Defendant has also filed an unopposed motion to supplement the record, asking the Court to consider TDIC's internal claims handling manual and defendant's accompanying arguments in ruling on the cross-motions for summary judgement. *See* Dkts. # 90, 91. Because the documents were produced after the parties' briefing on summary judgment closed, the Court finds that defendant has demonstrated the requisite diligence and grants the motion.

1    into his suite for tenant improvements" and is "directly contrary to the position taken by Dr.

2    Yousefian in his Motion for Summary Judgment . . . that the BPP benefits due under the Policy

3    should include repair costs for his tenant improvements, as well as tenant improvements done by

4    prior tenants . . . ." *Id.* at 1-2.

5        Defendant seeks to supplement the record with testimony from Troy Brogdon, TDIC's

6    Rule 30(b)(6) designee on the issue of the $330,000 difference between the EAS estimate and

7    the McBride estimate. Dkt. # 112 at 2. Specifically, defendant seeks to include Brogdon's

8    testimony that "he completely disregarded the EAS estimate when he prepared the McBride

9    estimate, because the EAS estimate was 'relatively worthless' for purposes of estimating the

10   actual damage to tenant improvements." *Id.* (citing Dkt. # 113-2 at 4-7). Brogdon "explained

11   this was because the EAS estimate was performed immediately after the fire and flooding, and

12   as such only a small portion of the total damage would have been apparent at the time." *Id.*

13   (citing Dkt. # 113-2 at 4-7). Defendant argues that this evidence "underscores TDIC's violations

14   of WAC 284-30-330 subsections (1) and (7)." *Id.* at 3.

15       Both of the depositions offered as supplemental evidence were conducted in February

16   2023, long after the briefing on the parties' cross-motions was completed. *See* Dkt. # 110-4;

17   Dkt. # 113-2. Thus, the Court finds the parties have demonstrated the requisite diligence and

18   GRANTS both motions to supplement the record. The Court will consider the proffered

19   supplemental evidence in its summary judgment ruling.

### D. Coverage Under the Terms of the Policy

21       Moving to the merits of each motion, the fundamental dispute between the parties is the

22   scope of coverage provided by Dr. Yousefian's policy. "Under Washington law, interpretation

23   of an insurance policy is a question of law for the court. The court must give the terms of the

24   policy a 'fair, reasonable, and sensible construction as would be given to the contract by the

25   average person purchasing insurance.'" *Sirius Am. Ins. Co. v. Young's Cap. Co., LLC*, No. C05-

26   338JLR, 2005 WL 1287965 (W.D. Wash. May 25, 2005) (quoting *Overton v. Consolidated Ins.*

27   *Co.*, 145 Wn. 2d 417, 424 (2002)). Any ambiguities are construed in favor of the insured; but a

28   clause is ambiguous only "when, on its face, it is fairly susceptible to two different

1   interpretations, both of which are reasonable." *Quadrant Corp. v. Am. States Ins. Co.*, 154 Wn.

2   2d 165, 171 (2005).

3          The Court begins by identifying the points on which the parties agree. First, both parties

4   agree that the dispute should be resolved pursuant to the plain text of the policy.[2] Dkt. # 67 at

5   11; Dkt. # 57 at 14-16. Second, both parties agree that the policy should be read in the

6   disjunctive, meaning "tenant improvements" are "fixtures, alterations, installments or additions

7   that are made a part of the building or structure you occupy but do not own" as well as "fixtures,

8   alterations, installments or additions that are made or acquired at your expense but that you

9   cannot legally remove." Dkt. # 57 at 15; Dkt. # 67 at 12.

10         A "fair, reasonable, and sensible construction" of this policy leads the Court to agree with

11  defendant that "tenant improvements" under the policy include both the tenant improvements

12  that were part of the suite prior to Dr. Yousefian's tenancy, and those improvements that Dr.

13  Yousefian paid to install himself. Plaintiff attempts to avoid this straightforward conclusion with

14  a number of arguments, all of which fail.

15         The Court addresses plaintiff's specific arguments below.

16

17

---

18         [2] Defendant initially presented an argument in his motion for summary judgment asserting that

19  Dr. Yousefian had an "insurable interest" in the existing Tenant Improvements. Dkt. # 57 at 10-14. This
    argument was put forth in anticipation that plaintiff would argue defendant had no insurable interest in

20  tenant improvements he did not personally pay for. *Id.* at 10. However, plaintiff's response and cross-
    motion revealed that it believes the "insurance coverage dispute presented in this matter does not raise

21  an issue of insurable interest." Dkt. # 67 at 13.

22         Plaintiff repeatedly asserts that this case does not raise an issue of insurable interest. *See, e.g.*,

23  Dkt. # 67 at 14 ("Even if this matter gave rise to an insurable interest issue, which it does not . . ."). 
    However, it also dedicates significant portions of its brief to explaining why "[d]efendants are factually

24  and legally unable to support their contention that they had an insurable interest in the building itself."
    *Id.* at 14, 16. Plaintiff also relies on *Gossett v. Farmers Ins. Co.*, 133 Wn. 2d 954 (1997), a case that

25  focuses on the issue of insurable interest, and notes that the policy under which defendant is insured
    prohibits paying defendant "more than [his] insurable interest in the Covered Property." *Id.* at 3, 4. Thus,

26  while plaintiff explicitly disavows the "insurable interest" issue, its brief appears to revive the argument
    in places. Because the Court finds that the scope of coverage can be resolved without addressing the

27  question of insurable interest and plaintiff has explicitly stated it does not believe the case raises an issue

28  of insurable interest, the Court declines to address the issue here.

### a. Plaintiff Argues That the Parties "Agree" on the McBride Estimate

Plaintiff first argues that defendant "agree[s] that the TDIC Policy provides coverage for the cost to repair the covered tenant improvements as set forth in the McBride Estimate." Dkt. # 67 at 12. However, it is clear from defendant's motion for summary judgment that he does not agree. Rather, defendant argues that he is entitled to coverage for additional repairs beyond those listed in the "tenant repairs" category of the McBride estimate. *See generally* Dkt. # 57.

Plaintiff argues that "McBride and [defendant's expert] Mr. Eggert met and ultimately agreed to each element of Tenant Improvement that ended up in the McBride Estimate." Dkt. # 78 at 3. However, defendant's expert, Terry Eggert, states in his declaration that this statement "is true *only* in the sense that I agreed with Mr. Brogdon as to: (1) the replacement cost value of each item in the McBride Estimate, including each item classified as Tenant Improvement and each item classified as Building; and (2) agreed with identification of those items of property that were reflected in the 2011 construction documents." Dkt. # 87 at 2-3 (emphasis in original).

### b. Plaintiff Argues That Because Another Insurer Paid, It Cannot Pay

Next, plaintiff argues that "[b]ecause another insurer has already assumed primary coverage for the building repairs and pre-tenancy tenant improvements, the TDIC Policy could only cover the costs to repair the tenant improvements purchased by Defendants during their tenancy." Dkt. # 78 at 1. However, as defendant points out, TDIC already disavowed this argument during its initial coverage determination. TDIC initially stated that it would not be able to pay for repairs to the tenant improvements where the building owner's insurer (Hartford) would be effecting repairs for "all the insured's improvements to the space," because Hartford's repairs would make defendant "whole." Dkt. # 68-1 at 2; Dkt. # 58 at 137. However, after learning that Dr. Yousefian's lease had been terminated and he would not be returning to the building as a tenant, TDIC stated that "as your lease has been terminated by the owner, we believe it is proper to pay you for the damage to your old office space as if we were repairing it. That will make you whole with respect to office repairs." Dkt. # 58 at 146. TDIC then provided

ORDER ON PARTIES' CROSS-MOTIONS
FOR SUMMARY JUDGMENT - 16

the EAS estimate (which included repairs beyond the tenant repairs that Dr. Yousefian personally paid for). Dkt. # 58 at 149-86. This estimate was provided after TDIC had learned that Hartford – the building's insurer – would be handling the repairs to the building. Dkt. # 58 at 146. Plaintiff's argument is severely undermined by its own conduct.

Additionally, plaintiff claims that Hartford has "assumed primary coverage for the building repairs and pre-tenancy tenant improvements," but fails to provide any evidentiary support for the assertion that Hartford is not also assuming coverage for tenant improvements Dr. Yousefian paid for. Dkt. # 67 at 13: *see also* Dkt. # 67 at 7 (stating "Hartford assumed primary coverage for the damages to the building and the tenant improvements provided prior to Defendants' tenancy" but providing no citation in support of this claim). Indeed, the language in plaintiff's claims file and summary judgment motion seems to suggest that Hartford assumed responsibility for *all* repairs to the building. *See* Dkt. # 67 at 6 (stating "TDIC indeed gave no suggestion that coverage depended upon whether Defendants purchased the tenant improvements out of pocket. It did not need to do so because the building owner claimed all tenant improvements and would be paying for the costs to repair the same."); Dkt. # 68-1 at 2 (log note stating that the "building owner owns all the insured's improvements to the space and [Hartford] would be the primarily, and only, carrier to effect repairs.").

Furthermore, plaintiff points to no policy provision that limits coverage in this situation. The only citation plaintiff offers in support of its argument is to *Gossett v. Farmers Ins. Co.*, 133 Wn. 2d 954, 967 (1997). Dkt. # 67 at 13. However, in *Gossett*, the Washington Supreme Court was considering whether plaintiffs had an insurable interest in a house they were renovating but did not own. 133 Wn. 2d at 959. Nowhere does *Gossett* discuss the consequences of another insurer taking over repairs to a damaged building. To the extent plaintiff seeks to revive the insurable interest argument through this citation, the Court declines to consider that argument as plaintiff has explicitly disavowed it in its motion. Dkt. # 67 at 13. Moreover, *Gossett* does not provide support for plaintiff's insurable interest argument. The *Gossett* court specifically remarked that the plaintiffs in that case were not "lessees" of the property and that because the property owner "could have demanded that the [plaintiffs] leave the premises at any time," the

ORDER ON PARTIES' CROSS-MOTIONS
FOR SUMMARY JUDGMENT - 17

1   plaintiffs "did not have a sufficient pecuniary interest in continued possession of the property" to
2   "establish an insurable interest in the entire replacement value of the house." 133 Wn. 2d at 972-
3   73. Here, in contrast, defendant was a lessee with a clear pecuniary interest in continued
4   possession of his suite. Furthermore, defendant in this case is not seeking to recover "the entire
5   replacement value" of the building, but simply of the "tenant improvements" to his suite as
6   defined under the policy. Plaintiff's argument fails.

7                                  **c.  Supplemental Evidence**

8          While the Court grants plaintiff's motion to supplement the record, it is unconvinced that
9   the deposition testimony of Angela Rutherford creates a genuine issue of material fact.
10  Washington courts have made clear that "if any clause is ambiguous the court must apply a
11  construction that is most favorable to the insured, even though the insurer may have intended
12  another meaning." *Vadheim v. Cont'l Ins. Co.*, 107 Wn. 2d 836, 841 (1987).  Here, TDIC has
13  failed to point to any evidence – other than Rutherford's understanding of the insurance policy –
14  to support its argument. Indeed, in the same deposition TDIC cites, Rutherford admitted that
15  there was nothing "in the underwriting file that would indicate that the $400,000 of business
16  personal property coverage was limited to equipment and tenant improvements that Dr.
17  Yousefian added after April 1st." Dkt. #110-4 at 4. The Court need not address the credibility
18  issues defendant raises with regard to Ms. Rutherford's testimony, *see* Dkt. # 112 at 3, because it
19  concludes that TDIC may not rely on the interpretation or understanding of its own employees
20  to create a genuine issue of material fact as to the meaning of the insurance policy, which is
21  instead governed by the plain language of the policy.

22                                 **d.  Coverage Under the Policy**

23         The parties agree that the plain language of the policy states that Dr. Yousefian is covered
24  for damage to "fixtures, alterations, installments or additions that are made a part of the building
25  or structure that [he] occup[ies] but do[es] not own" *as well as* "fixtures, alterations, installments
26  or additions that are made or acquired at [his] expense but that [he] cannot legally remove."
27  Defendant has established that under the plain language of the policy, Dr. Yousefian is entitled
28  to coverage for "tenant improvements" in his suite, even if he did not personally pay to have

ORDER ON PARTIES' CROSS-MOTIONS
FOR SUMMARY JUDGMENT - 18

them installed. Plaintiff points to no language in the policy supporting its argument that another insurer's repairs to the building (where defendant is no longer a tenant) releases it from this coverage obligation or its argument that Dr. Yousefian cannot be covered for improvements he never "owned" and was not legally required to repair. Plaintiff's original June 2020 coverage determination, as described in the EAS estimate, accurately captures the scope of repairs covered by this provision.

The Court GRANTS summary judgment to defendant on the scope of coverage issue, finding Dr. Yousefian has a right to coverage for all tenant improvements TDIC identified as covered in its June 2020 coverage determination, regardless of whether the improvements were there when he took occupancy or were added by him afterward. Plaintiff's motion for summary judgment on the issue of coverage is accordingly DENIED.

### ii. Valuation of Loss

In his motion for summary judgment, defendant asked that the Court enter summary judgment finding the correct valuation of the covered loss is $461,087.15. Dkt. # 57 at 3. However, in his reply brief, defendant announced that he "does not seek a ruling on the dollar amount of the damage to the Existing Improvements, only that they were covered under the Policy and TDIC's categorical exclusion of them was improper." Dkt. # 89-1 at 4. The Court therefore will not rule on the valuation arguments raised by defendant in his motion for partial summary judgment.

Plaintiff, on the other hand, asks the Court to enter summary judgment finding that it has "paid all amounts potentially owed under the TDIC Policy to date." Dkt. # 67 at 3.

While defendant's reply brief makes clear that he does not ask the Court to make a ruling on valuation at this stage in the litigation, the Court considers the valuation arguments put forth in his motion for summary judgment in ruling on plaintiff's motion. In his motion for summary judgment, defendant argued that the correct valuation of the covered loss is $461,087.15 (the total amount of both the "building" and "tenant improvement" repairs in the McBride estimate). Dkt. # 57 at 3. Defendant argues that the EAS estimate and McBride estimate cover the same scope of repairs, but at very different valuations. *See id.* at 20 (alleging that there is no "dispute

ORDER ON PARTIES' CROSS-MOTIONS
FOR SUMMARY JUDGMENT - 19

1  that, in its McBride Estimate, TDIC valued the same loss at $461,087 (while conveniently

2  changing its coverage position to make up almost all the difference)"). Accordingly, defendant

3  concludes that if the Court finds he is entitled to the repairs identified in the EAS estimate, it

4  should look to the McBride estimate for an accurate calculation of the costs of these repairs. *Id.*

5  at 9.

6        Plaintiff argues that defendant's claim that he is entitled to $461,087.15 is based on a

7  misinterpretation of the McBride estimate. Dkt. # 78 at 4-5. TDIC claims that the scope of its

8  initial estimate, prepared by EAS, "did not include the costs to repair the entire building." Dkt.

9  # 78 at 3. It further claims that in the McBride estimate, the experts were tasked with creating

10 "an estimate for the repairs to the entire building, breaking out the Tenant Improvements to the

11 Defendants' unit." Dkt. # 78 at 3. Accordingly, "[t]he McBride estimate included both the costs

12 to repair the tenant improvements and the entire building." *Id.* Thus, plaintiff appears to assert

13 that there are repairs in the McBride estimate that were not captured in the EAS estimate. *Id.* at

14 4-5 (comparing costs in the McBride and EAS estimates).

15       The Court agrees with defendant that plaintiff's decision to list many of the repairs in the

16 McBride estimate as "building" repairs appears to be largely semantic, and does not necessarily

17 mean they are not covered "tenant improvements." An interrogatory response from plaintiff

18 shows that (1) many of the repairs included in the original EAS estimate were included as a

19 "building" items in the McBride estimate and (2) many of the repairs included in the EAS

20 estimate were not included as "tenant improvement" items in the McBride estimate. Dkt. # 72 at

21 28.

22       This evidence demonstrates that the EAS estimate captured repairs that were not captured

23 in the "tenant improvements" category of the McBride estimate. However, plaintiff has only

24 paid defendant the value of the "tenant improvements" category of the McBride estimate. Thus,

25 plaintiff has not paid "all amounts potentially owed under the TDIC Policy to date," as plaintiff

26 is still required to pay defendant for the repairs captured in the EAS estimate that were not

27 included in the "tenant improvement" category of the McBride estimate. The Court DENIES

28 plaintiff's motion for summary judgment on this issue.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

### iii.  Mend the Hold

Defendant argues that the "mend the hold" doctrine prohibits plaintiff from "abandoning [its] June 2020 coverage determination." Dkt. # 57 at 17. The "mend the hold" doctrine "forbids a contract party, particularly when it is an insurance company, to change its position on the meaning of the contract in the middle of litigation over it." *Utica Mut. Ins. Co. v. Vigo Coal Co.*, 393 F.3d 707, 716 (7th Cir. 2004). "Although Washington has never recognized the 'mend the hold' doctrine . . . its doctrines of waiver and estoppel are functionally similar." *McAlpine v. State Farm Fire and Cas. Ins. Co.*, 540 Fed. App'x 559, 560 (9th Cir. 2013) (citations omitted). For example, the Washington Supreme Court has recognized "the general rule that if an insurer denies liability under the policy for one reason, while having knowledge of other grounds for denying liability, it is estopped from later raising the other grounds in an attempt to escape liability, provided that the insured was prejudiced by the insurer's failure to initially raise the other grounds." *Bosko v. Pitts & Still, Inc.*, 75 Wn. 2d 856, 864 (1969). As this recitation of the "general rule" suggests, cases applying this doctrine typically deal with denials of liability. *See*, *e.g.*, *Bosko*, 75 Wn. 2d at 860-64 (applying the rule where insurance company denied coverage); *Karpenski v. Am. Gen. Life Cos.*, *LLC*, 999 F. Supp. 2d 1235, 1245 (W.D. Wash. 2014) (applying the rule where insurance company sent a formal denial letter rescinding insured's policy); *Them v. Manhattanlife Assurance Co. of Am.*, No. C19-6034-RBL, 2020 WL 4788022, at *3 (W.D. Wash. Aug. 18, 2020) (stating the rule as "insurers cannot identify new provisions supporting a coverage denial in the midst of litigation"); *Vision One, LLC v. Phila. Indem. Ins. Co.*, 158 Wn. App. 91, 103 (2010) ("When an insurer denies coverage for one reason, with knowledge of other reasons for denying coverage, the insurer may be precluded from raising new grounds for denying coverage under traditional principles of estoppel."); *Ledcor Indus. (USA) Inc. v. Va. Sur. Co.*, No. C9-1807-RSM, 2012 WL 223904, at *2 (W.D. Wash. Jan. 25, 2012) (applying rule where insurance company "expressly denied coverage on basis of the progressive loss and fungus exclusion" but later tried to raise the argument that coverage could have been denied under the policy's "other insurance" policy, concluding that the "failure to assert the 'other insurance' provision in the denial letter precludes it from doing so [in this

ORDER ON PARTIES' CROSS-MOTIONS
FOR SUMMARY JUDGMENT - 21

1  litigation]"); *Cumming v. United Servs. Auto. Ass'n*, 15 Wn. App. 2d 1044, 2020 WL 7233162,

2  at *8-9 (Wash. Ct. App. 2020) ("Although insurers are not expressly precluded from modifying

3  the basis for denying a claim, Washington courts have recognized a form of equitable estoppel

4  that applies when an insurer shifts its grounds for denying an insurance claim after submitting an

5  initial denial letter.").

6          Defendant attempts to broaden this estoppel doctrine, arguing that it stands for the

7  proposition that "an insurer may not rely on one argument in making a coverage decision and

8  then later, after litigation begins, switch to a different argument, if the policyholder relied on the

9  insurer's initial position to its detriment." Dkt. # 57 at 17. However, all of the cases cited by

10 defendant in support of this argument present a distinct fact pattern, in which (a) an insured is

11 denied coverage; (b) the insurance company informs the insured of the reason for denial in a

12 denial letter; and (c) the insurance company later attempts to introduce an alternate rationale for

13 denial in the course of litigation. Indeed, Washington courts discuss the estoppel doctrine in

14 conjunction with WAC § 284–30–380, which imposes an affirmative duty on insurers to specify

15 the basis for denying a claim in their written denials. *See Hayden v. Mut. of Enumclaw Ins. Co.*,

16 141 Wn. 2d 55, 61-63 (Wash. 2000); *Cumming*, 2020 WL 7233162, at *8.

17         Here, by contrast, TDIC has not denied defendant's claim. Both parties agree that Dr.

18 Yousefian's claim is "covered" by the policy – they simply dispute the scope of that coverage.

19 Accordingly, defendant is attempting to use the estoppel doctrine to bind TDIC to its initial

20 coverage determination, rather than its reason for denying coverage. Because the Court has

21 already concluded that defendant is entitled to coverage for the repairs identified in TDIC's

22 initial estimate under the plain language of the policy, it declines to opine on whether the

23 estoppel doctrine stretches broadly enough to reach the case at hand.[3]

24

25         [3] Accordingly, the Court also declines to address the parties' arguments as to the significance of

26 the Washington Supreme Court's decision in *Coventry Assocs. v. Am. States Ins. Co.*, 136 Wn. 2d 269
   (1998). *See, e.g.*, Dkt. # 112 at 6. In *Coventry*, the court explained that "coverage by estoppel" is not

27 available to a first party insured bringing a claim of bad faith investigation against its insurer. 136 Wn.
   2d at 285. Instead, the insured's damages are "limited to the amounts it has incurred as a result of the

28 bad faith investigation, as well as general tort damages." *Id.* Here, plaintiff argues that this means the

ORDER ON PARTIES' CROSS-MOTIONS
FOR SUMMARY JUDGMENT - 22

1

### E.  Extra-Contractual Claims

2   In addition to his claims regarding the scope of coverage under the policy, defendant also

3   brings a number of extra-contractual claims alleging that TDIC has acted in bad faith and has

4   violated both the Insurance Fair Conduct Act and the Washington Consumer Protection Act.

5   Plaintiff argues that defendant is unable to meet his burden of proof on these claims and asks the

6   Court to grant summary judgment in its favor. The Court turns to each of the extra-contractual

7   claims in turn.

8

### i.  Bad Faith

9   Defendant claims that plaintiff "engaged in bad faith in several ways." Dkt. # 57 at 20

10  (capitalization modified). Specifically, defendant claims TDIC acted in bad faith by (1)

11  undervaluing the loss and attempting to coerce Dr. Yousefian; (2) drastically changing its

12  coverage position based on information it knew or should have known six months earlier; and

13  (3) misrepresenting the insurable interest doctrine in its January 2021 coverage determination.

14  *Id.* at 20-23.

15  Under Washington law, "[a]n action for bad faith handling of an insurance claim sounds

16  in tort." *Safeco Ins. Co. of Am. v. Butler*, 118 Wn. 2d 383, 389 (1992). "Claims of insurer bad

17  faith 'are analyzed applying the same principles as any other tort: duty, breach of that duty, and

18  damages proximately caused by any breach of duty.'" *Mut. of Enumclaw Ins. Co. v. Dan*

19  *Paulson Const., Inc.*, 161 Wn. 2d 903, 916 (2007) (quoting *Smith v. Safeco Ins. Co.*, 150 Wn. 2d

20  478, 485 (2003)). "In order to establish bad faith, an insured is required to show the breach was

21  unreasonable, frivolous, or unfounded." *Id.* (quoting *Kirk v. Mount Airy Ins. Co.*, 134 Wn. 2d

22  558, 560 (1998)). Additionally, the insured must establish it was harmed by the insurer's bad

23  faith acts. *Safeco*, 118 Wn. 2d at 389 (explaining "a showing of harm is an essential element of

24  an action for bad faith handling of an insurance claim").

25

26  remedy of coverage by estoppel is never permitted in the first party insurance context. Dkt. # 112 at 6.
27  Defendant argues that "even if *Coventry* precludes application of the mend the hold doctrine premised
    solely on an insurer's bad faith, it says nothing about applying the doctrine based on traditional equitable
28  estoppel, that is, an insurer's change of position causing prejudice to the policyholder." *Id.*

ORDER ON PARTIES' CROSS-MOTIONS
FOR SUMMARY JUDGMENT - 23

While "[a]n action for bad faith handling of an insurance claim sounds in tort," *id.*, the Washington "Insurance Commissioner has promulgated regulations that define specific acts and practices that constitute a breach of an insurer's duty of good faith." *Am. Manufacturers Mut. Ins. Co. v. Osborn*, 104 Wn. App. 686, 697 (2001) (citing RCW § 48.30.010; WAC § 284–30–300 to –800; *Tank v. State Farm Fire & Cas. Co.*, 105 Wn. 2d 381, 386 (1986)).

In analyzing claims of insurance bad faith on summary judgment, the Washington Supreme Court has stated:

> Whether an insurer acted in bad faith is a question of fact. Accordingly, an insurer is entitled to a directed verdict or a dismissal on summary judgment of a policyholder's bad faith claim only if there are no disputed material facts pertaining to the reasonableness of the insurer's conduct under the circumstances, or the insurance company is entitled to prevail as a matter of law on the facts construed most favorably to the nonmoving party.

*Smith*, 150 Wn. 2d at 484 (internal citations omitted). The Court addresses each of defendant's alleged grounds for bad faith in turn.

### a. Undervaluing Loss and Coercion

Defendant first argues that TDIC acted in bad faith by initially valuing the covered loss at $139,295. Defendant contends that $139,295 is a substantial undervaluation, pointing to the fact that (1) the McBride estimate done during the appraisal process estimated total cost to repair both "building" and "tenant improvement" damages at $461,087; and (2) at the time TDIC communicated the $139,295 estimate to Dr. Yousefian, the company's own internal documents indicated that the covered loss was more than three times as much. Dkt. # 89-1 at 12. Defendant further argues that it was bad faith for TDIC to fail to disclose the higher internal valuation of the loss to Dr. Yousefian. *Id.*

Defendant asserts that this conduct violated TDIC's responsibility to conduct a "reasonable investigation," *see Coventry Assocs. v. Am. States Ins. Co.*, 136 Wn. 2d 269, 281 (1998), because it "is not plausible that a reasonable investigation would have yielded" a valuation so much lower than TDIC's own internal evaluation or the subsequent McBride estimate. Dkt. # 57 at 20; Dkt. # 98-1 at 14. Defendant also asserts that this conduct violates

several Washington regulations that define specific acts and practices that constitute a breach of an insurer's duty of good faith, including: (1) "Misrepresenting pertinent facts or insurance policy provisions," WAC § 284-30-330(1); (2) "Failing to promptly provide a reasonable explanation of the basis in the insurance policy in relation to the facts or applicable law for denial of a claim or for the offer of a compromise settlement," WAC § 284-30-330(13); and (3) "Compelling a first party claimant to initiate or submit to litigation, arbitration, or appraisal to recover amounts due under an insurance policy by offering substantially less than the amounts ultimately recovered in such actions or proceedings," WAC § 284-30-330(7).

Plaintiff responds that through its "good faith investigation," it initially determined defendant was owed $139,295.83 for tenant improvements pursuant to the EAS estimate. Dkt. # 67 at 17. It further contends that the McBride Estimate only increased what defendant was owed by $8,118.99, which it subsequently paid to defendant. *Id.* Accordingly, plaintiff argues that it has paid all amounts due to defendant and has not violated its duty of good faith. *Id.*

As an initial note, the Court finds that defendant cannot, at this stage in the litigation, bring a claim under WAC § 284-30-330(13), which prohibits "[c]ompelling a first party claimant to initiate or submit to litigation, arbitration, or appraisal to recover amounts due under an insurance policy by offering substantially less than the amounts ultimately recovered in such actions or proceedings." Here, while defendant has submitted to litigation and appraisal, no amount has yet been recovered in either proceeding.

Defendant's remaining claims rest on the assertion that plaintiff drastically undervalued the value of the loss identified in the EAS estimate. However, the Court finds that material issues of fact preclude summary judgment on this issue. Defendant has failed to put forth evidence conclusively establishing that the scope of the EAS estimate and the McBride estimate are identical. *See, e.g.*, Dkt. # 57 at 9 (stating that the McBride estimate "valued all the improvements TDIC had deemed covered in June 2020 at $461,087.15," but not providing any citation for this assertion). Furthermore, plaintiff asserts that there are repairs in the McBride estimate that were not included in the EAS estimate. Dkt. # 78 at 3. Thus, the Court cannot

ORDER ON PARTIES' CROSS-MOTIONS
FOR SUMMARY JUDGMENT - 25

conclude on this record that TDIC initially valued the loss at $139,295.83 and subsequently valued the identical loss at $461,087.15.

However, the Court is also unconvinced by plaintiff's argument that the difference in valuation between the first and second estimate was only $8,118.99. As discussed above, the "tenant improvement" category of the McBride estimate fails to include many of the repairs originally captured in the EAS estimate. The Court finds there are genuine issues of fact as to the extent to which the full McBride estimate (tenant improvements *and* building improvements) and the EAS estimate overlap.

Defendant also relies on estimates noted in TDIC's internal documents to support the conclusion that TDIC failed to reasonably investigate the claim or misrepresented key facts when it valued the loss at $139,295. Specifically, defendant points out that in a June 10, 2020 email from TDIC's internal adjuster Robert Petty to his supervisor, Mr. Petty wrote: "We believe the insured may reach up to $450,000 [Business Personal Property] . . . therefore we have reserved this claim for $1.2 million." Dkt. # 86 at 5. In an internal memorandum dated the same day, Mr. Petty wrote to the same supervisor: "I anticipate payouts in the following areas: BPP $450,000; LBI $650,000; EE $100,000. I seek $1 million authority to settle this claim." *Id.* at 8. However, on that same day, Mr. Petty wrote to Dr. Yousefian, explaining that for the same Business Personal Property claim he was owed just $139,295. Dkt. # 58 at 146. Defendant further notes that TDIC's internal claims handling manual states that "reserves will reflect the ultimate settlement evaluation prior to the settlement." Dkt. # 91 at 14.

While this evidence suggests that TDIC internally valued the loss at a higher value than the EAS estimate, the comments made by Mr. Petty are not conclusive ("We *believe* the insured *may* reach up to $450,000" and "I *anticipate* payouts in the following areas") and there is no information explaining how Mr. Petty reached these estimates. There is also evidence to suggest that Mr. Petty's estimate may have included payment for Dr. Yousefian's damaged dental equipment. *See* Dkt. # 115 at 2. Furthermore, plaintiff's estimate was based on a detailed assessment prepared by an independent field adjuster. *Cf. Morella v. Safeco Ins. Co. of Ill.*, No. C12-672-RSL, 2013 WL 1562032, at *2-*3 (W.D. Wash. Apr. 12, 2013) (finding bad faith

1  where insurer calculated claim value at between $11,194.80 and $15,694.80, but made insured a

2  settlement offer of $1,500 with no explanation as to why the $1,500 was offered); *see also*

3  *Keller v. Allstate*, 81 Wn. App. 624, 634 (1996) (explaining that the difference in the amount of

4  the offer and the amount of the eventual settlement does not, by itself, show that the insurer

5  acted in bad faith, but instead the issue turns on whether the insurer had "reasonable

6  justification" for its low settlement offer).

7       In defendant's response to the motion to supplement the record, he argues that the Court

8  should also consider the testimony of Troy Brogdon, who conducted the McBride estimate, in

9  considering whether TDIC's actions constituted violations of WAC 284-30-330 subsections (1)

10  and (7). Dkt. # 112 at 2-3.[4] Specifically, Brogdon testified that he did not use the EAS estimate

11  at all in preparing his own estimate, and that the EAS estimate was "relatively worthless"

12  because "[t]he conditions of the loss were so significantly different than what would have been

13  inspected during the EAS inspection." Dkt. # 113-2 at 6. Brogdon explained that it is "pretty

14  typical" for estimates to be conducted "within the week" for insurance claims, but that at that

15  time, much of the "mitigation and demo" work has not yet been completed. *Id.*

16       The Washington Supreme Court has explained that "[a]s long as the insurance company

17  acts with honesty, bases its decision on adequate information, and does not overemphasize its

18  own interests, an insured is not entitled to base a bad faith or CPA claim against its insurer on

19  the basis of a *good* faith mistake." *Coventry*, 136 Wn. 2d at 281 (emphasis in original). Here,

20  while Brogdon's testimony supports a conclusion that the EAS estimate may not be reliable,

21  there is nothing to indicate that TDIC acted in bad faith when it hired EAS to produce an

22  estimate of the damage shortly after the fire. Indeed, Brogdon's testimony provides a reasonable

23  explanation for why TDIC's initial estimation may have been incorrect. *See also* Dkt. # 115 at 1-

24  2. Accordingly, the Court finds that this supplemental evidence does not support a finding of

25  bad faith on summary judgment.

26

27

28      [4] As explained above, the Court finds that subsection (7) is not yet available to defendant.

ORDER ON PARTIES' CROSS-MOTIONS
FOR SUMMARY JUDGMENT - 27

1    Based on the evidence presented, the Court concludes that there is a genuine dispute of

2 material fact regarding the reasonableness of TDIC's valuation of the property identified in the

3 EAS estimate, and accordingly DENIES both parties' motions for summary judgment on this

4 issue.

5                          **b.  Drastically Changing Coverage Position**

6    Defendant next argues that plaintiff acted in bad faith by drastically changing its

7 coverage position. Specifically, TDIC originally interpreted "tenant improvements" to include

8 "pretty much everything anything and everything in your office," but later reneged, narrowing

9 the scope of covered "tenant improvements" to only the improvements that Dr. Yousefian

10 personally paid to have installed during his tenancy. Dkt. # 57 at 21-23; *see also* Dkt. # 58 at 86;

11 Dkt. # 59 at 74-80.

12    Defendant frames this wrongdoing as a "failure to investigate."[5] Dkt. # 57 at 21-23.

13 Specifically, he claims that if, as TDIC now claims, it was necessary to identify the tenant

14 improvements for which Dr. Yousefian had personally paid when determining the scope of

15 coverage, it was unreasonable for TDIC to wait until after it had already provided its coverage

16 determination to begin investigating this issue. *Id.*

17    Plaintiff, in response, argues that "[u]pon receipt of notice of the subject loss, TDIC

18 promptly opened a claim and initiated its good faith claims investigation." Dkt. # 67 at 17. It

19 further argues that "[b]ased on all information made available to it in March of 2020, TDIC

20 advised Defendants of the coverage available under the TDIC Policy regarding the subject loss."

21 *Id.* Finally, it concludes that "in April of 2020, TDIC learned that the building's property insurer

22 was assuming primary coverage for the building repairs and tenant improvements. As a result,

23

24    ───────────────
    [5] Defendant acknowledges that his failure to investigate claim is somewhat unique, as he

25 believes TDIC's "failure to investigate who purchased which improvements was reasonable, because
that question was irrelevant." Dkt. # 57 at 22 n.2. Instead, he argues that after "having made its June

26 2020 Coverage Determination, TDIC could not months later exclude two-thirds of the improvements
based on the insurable interest doctrine and simultaneously argue its earlier determination was grounded

27 on a reasonable investigation." *Id.*

28

ORDER ON PARTIES' CROSS-MOTIONS
FOR SUMMARY JUDGMENT - 28

1   TDIC would not be responsible for paying for the building and tenant improvement costs that

2   Hartford was covering." *Id.*

3        Plaintiff's response fails to substantively address defendant's allegations. Indeed,

4   plaintiff's response even fails to accurately represent its own initial coverage determination.

5   While plaintiff did at one point inform defendant that another insurer was taking over repairs to

6   the building and tenant improvements (and thus TDIC would not be responsible for defendant's

7   "tenant improvement" repairs), TDIC later confirmed that they *would* cover the "tenant

8   improvement" repairs upon learning that defendant's lease had been terminated. Dkt. # 58 at

9   146.

10        In plaintiff's original coverage determination and correspondence with defendant it failed

11   to mention even once that the scope of coverage would turn on whether defendant had

12   personally paid for "tenant improvements" to be installed. Dkt. # 58 at 146. Dr. Yousefian first

13   learned of the alleged importance of this distinction in plaintiff's January 2021 coverage

14   determination letter. Dkt. # 59 at 74-80.

15        As discussed above, the "implied covenant of good faith and fair dealing . . . requires the

16   insurer to perform any necessary investigation in a timely fashion and to conduct a reasonable

17   investigation" in response to a claim made by an insured. *James E. Torina Fine Homes, Inc. v.*

18   *Mut. of Enumclaw Ins. Co.*, 118 Wn. App. 12, 16 (2003). Under the Washington Administrative

19   Code, "[e]very insurer must complete its investigation of a claim within thirty days after

20   notification of claim, unless the investigation cannot reasonably be completed within that time."

21   WAC § 284-30-370; *see also* WAC § 284-30-330(3) (explaining that insurers must "adopt and

22   implement reasonable standards for the prompt investigation of claims arising under insurance

23   policies"). Additionally, "[i]f the insurer needs more time to determine whether a first party

24   claim should be accepted or denied, it must notify the first party claimant within fifteen working

25   days after receipt of the proofs of loss giving the reasons more time is needed." WAC § 284-30-

26   380(3).

27        Plaintiff's failure to identify or investigate such an allegedly critical element of its

28   coverage determination until months after it had provided defendant with its initial coverage

ORDER ON PARTIES' CROSS-MOTIONS
FOR SUMMARY JUDGMENT - 29

determination is a violation of the covenant of good faith. To the extent plaintiff relies upon its contention that it could not have determined which tenant improvements were covered under the policy until it gained the power to issue third-party subpoenas through this litigation,[6] this argument is unavailing. The only evidence plaintiff offers to demonstrate that it was unable to get this information directly from Dr. Yousefian is an email TDIC sent in August 2020, two months *after* it had provided Dr. Yousefian with its initial coverage determination. *See* Dkt. # 67 at 8 (citing Dkt. # 68-4). Plaintiff had a duty to reasonably investigate defendant's claim within the time frames established by the WAC regulations. Plaintiff's failure to do so constitutes a breach of that duty.

In addition to duty and breach, the final element of a bad faith claim is harm to the insured. "Tort claims for the breach of the duty of good faith, also known as insurance bad faith claims, allow for recovery of expenses; consequential damages; and 'general tort damages,' including noneconomic damages such as emotional distress caused by the breach of the duty of good faith." *Beasley v. GEICO Gen. Ins. Co.*, 23 Wn. App. 2d 641, 661 (2022) (collecting cases). However, there is no rebuttable presumption of harm in the first-party insurance context. *Coventry*, 136 Wn. 2d at 281. Instead, the insured "must prove actual harm, and its 'damages are limited to the amounts it has incurred as a result of the bad faith . . . as well as general tort damages.'" *St. Paul Fire & Marine Ins. Co. v. Onvia, Inc.*, 165 Wash. 2d 122, 133 (2008) (quoting *Coventry*, 136 Wn. 2d at 285).

Here, defendant argues that he was harmed by being "denied the use of the funds to which he was entitled and by expending money in reliance on TDIC's June 2020 Coverage Determination." Dkt. # 57 at 23. To the extent defendant relies on the money and time he has spent on this litigation and the appraisal process, the Court does not agree that these constitute "harm" under a bad faith claim. The harm must be incurred "as a result of" the bad faith. Here, defendant participated in litigation and pursued appraisal before learning of plaintiff's changed

---

[6] Plaintiff does not raise this argument in its response to defendant's bad faith claims but does elsewhere in its cross-motion. *See* Dkt. # 67 at 24.

1  scope determination. Thus, those costs cannot be said to be incurred "as a result" of the changed

2  coverage determination.

3  However, the Court agrees that, as a result of plaintiff's eleventh-hour change in the

4  scope of coverage determination (and associated failure to investigate), defendant has been

5  denied the use of funds to which he was entitled. Specifically, the parties both agree on the

6  valuation of the repairs contained in the McBride estimate, Dkt. # 78 at 3; Dkt. # 87 at 2-3, but

7  under plaintiff's new theory of the scope of coverage, defendant is covered for substantially

8  fewer repairs than he would have been under plaintiff's original determination, *see* Dkt. # 72 at

9  28. Thus, defendant has not been fully compensated for his loss under the terms of his policy

10 and has been injured by the denial of funds to which he is entitled.

11 Accordingly, the Court GRANTS summary judgment to defendant on this issue and

12 DENIES plaintiff's cross-motion for summary judgment.

13 ### c.  Misrepresented Insurable Interest Doctrine

14 Finally, defendant also argues that "[t]he bad faith of TDIC's change of coverage position

15 is compounded by the fact that its January 2021 Coverage Position . . . was unreasonable and

16 unsupported by the law or the Policy language." *See* Dkt. # 70 at 24. Defendant contends that

17 plaintiff's reliance on *Gossett* and the "insurable interest" doctrine in its January 2021 coverage

18 determination violated WAC § 284-30-330(13), which requires that insurers "provide a

19 reasonable explanation" for "denial of a claim or the offer of a compromise settlement." Dkt.

20 # 57 at 23.

21 However, this regulation applies only to the "denial of a claim or the offer of a

22 compromise settlement," and plaintiff's January 2021 letter appears to be neither. In the

23 introduction of the letter, plaintiff's counsel explains that "[a]s requested during our conferences

24 regarding resolution of this matter, the following sets forth [TDIC's] coverage analysis with

25 regard to the Tenant Improvement claim at issue." Dkt. # 59 at 74. Thus, the Court concludes

26 that the "coverage analysis" sent to defendant's counsel is not a communication covered by this

27 regulation.

28 ### ii.  IFCA Claim

ORDER ON PARTIES' CROSS-MOTIONS
FOR SUMMARY JUDGMENT - 31

1    Defendant asserts that plaintiff has violated the Insurance Fair Conduct Act. Under the

2    IFCA, "[a]ny first party claimant to a policy of insurance who is unreasonably denied a claim

3    for coverage or payment of benefits by an insurer may bring an action . . . to recover the actual

4    damages sustained, together with the costs of the action, including reasonable attorneys' fees

5    and litigation costs." RCW § 48.30.015(1). The IFCA further directs courts to grant attorney's

6    fees and authorizes courts to award treble damages if the insurer either acts unreasonably or

7    violates certain insurance regulations. RCW § 48.30.015(2)-(3), (5). However, the "IFCA does

8    not create an independent cause of action for regulatory violations." *Perez-Crisantos v. State*

9    *Farm Fire & Cas. Co.*, 187 Wn. 2d 669, 684 (2017). Thus, to bring a claim under the statute, the

10   insured must establish that their insurer has unreasonably denied (1) a claim for coverage or (2)

11   payment of benefits. *Id.*

12   Plaintiff argues that an IFCA claim cannot stand because it has neither denied

13   defendant's claim for coverage nor payment of benefits. Dkt. # 67 at 21-22. However, this Court

14   has previously explained that:

> [A]n insurer cannot escape IFCA simply by accepting a claim and paying or
> offering to pay an unreasonable amount . . . . Where the insurer pays or offers to
> pay a paltry amount that is not in line with the losses claimed, is not based on a
> reasoned evaluation of the facts (as known or, in some cases, as would have been
> known had the insurer adequately investigated the claim), and would not
> compensate the insured for the loss at issue, the benefits promised in the policy are
> effectively denied. If, on the other hand, the insurer makes a reasonable payment
> based on the known facts or is making a good faith effort to appropriately value
> the loss, the fact that the insured did not immediately get all of the benefits to
> which it may ultimately be entitled does not establish an "unreasonable denial of
> payment of benefits."

23   *Morella*, 2013 WL 1562032, at *3. Here, defendant argues that plaintiff's "lowball" offer

24   violates WAC 284–30–330(7) and provides a basis for his claim under the IFCA. Dkt. # 57 at

25   24. The Washington Supreme Court has made clear that a regulatory violation alone is not

26   actionable under IFCA – the insured must also establish that their insurer has unreasonably

27   denied (1) a claim for coverage or (2) payment of benefits. Thus, defendant may not rely on its

28   claim that plaintiff violated WAC 284–30–330(7) as the basis for its IFCA claim. Furthermore,

ORDER ON PARTIES' CROSS-MOTIONS
FOR SUMMARY JUDGMENT - 32

as discussed above, there are material issues of fact regarding the reasonableness of TDIC's

initial valuation of the covered loss. Thus, there are material issues of fact precluding summary

judgment on whether plaintiff's actions constituted an unreasonable denial of payment of

benefits.

Plaintiff also argues that defendant's IFCA claim must be dismissed because he cannot

establish any "actual damages," as required under the statute. However, the term "actual

damages" in the IFCA context has been interpreted broadly by Washington courts. *See Beasley*,

23 Wn. App at 666 (finding that "actual damages" in the IFCA context includes non-economic

damages). Furthermore, as discussed above, defendant has been injured by the denial of funds

he is owed under the terms of his policy.

Accordingly, the Court DENIES both parties' motions for summary judgment on the

IFCA claims.

### iii. CPA Claim

Defendant further argues that plaintiff violated the Washington Consumer Protection Act.

A Consumer Protection Act claim in the insurance context requires "(1) an unfair or deceptive

practice, (2) in trade or commerce, (3) that impacts the public interest, (4) which causes injury to

the party in his business or property, and (5) which injury is causally linked to the unfair or

deceptive act." *Industrial Indem. Co. of the N.W., Inc. v. Kallevig*, 114 Wn. 2d 907, 920-21

(1990). A CPA claim can be predicated on a violation of WAC § 284–30–330. *Id.* at 923 ("A

violation of WAC 284–30–330 constitutes a violation of RCW 48.30.010(1), which in turn

constitutes a per se unfair trade practice by virtue of the legislative declaration in RCW

19.86.170."). Furthermore, "Consumer Protection Act claims alleging unfair insurance claims

practices meet the public interest element because RCW 48.01.030 declares that the 'business of

insurance is one affected by the public interest.'" *Anderson v. State Farm Mut. Ins. Co.*, 101

Wn. App. 323, 330 (2000). As to the injury requirement, only injuries to business or property

are recoverable in a Consumer Protection Act claim. *Kallevig*, 114 Wn. 2d at 920; *see also*

*Panang v. Farmers Ins. Co. of Wash.*, 166 Wn. 2d 27, 62 (2009).

ORDER ON PARTIES' CROSS-MOTIONS
FOR SUMMARY JUDGMENT - 33

1    Here, defendant argues that "TDIC violated the CPA by violating several provisions set

2    forth at WAC 284-30-330" but does not specify the specific provisions. Dkt. # 57 at 25. The

3    Court assumes that defendant relies on the same WAC provisions cited in his bad faith and

4    IFCA arguments. The Court has found that WAC § 284-30-330(7) is not applicable to

5    defendant's claim and that genuine issues of material fact preclude summary judgment on the

6    issue of whether plaintiff violated WAC § 284-30-330(1) or (13).[7]

7    Plaintiff argues that defendant's CPA claim should be dismissed at the summary

8    judgment stage because he cannot show injury to his "business or property." Dkt. # 67 at 20-21.

9    While the Court agrees that the costs of bringing a CPA claim in litigation do not meet the

10   "injury" requirement, *see Panang*, 166 Wn. 2d at 62, defendant also alleges that he has been

11   injured by being denied funds for repairs to which he is entitled. Dkt. # 57 at 25. The Court

12   concludes that this is an injury to defendant's business or property and is causally linked to

13   plaintiff's alleged unfair or deceptive act. *See Sign-O-Lite Signs, Inc. v. DeLaurenti Florists,*

14   *Inc.*, 64 Wn. App. 553, 563-65 (1992) (explaining that "the injury need not be great," "no

15   monetary damages need be proven," and "nonquantifiable injuries, such as loss of goodwill" are

16   sufficient (internal quotation marks and citations omitted)); *Mason v. Mortg. Am., Inc.*, 114 Wn.

17   2d 842, 854 (1990) ("A loss of use of property which is causally related to an unfair or deceptive

18   act or practice is sufficient injury to constitute the fourth element of a Consumer Protection Act

19   violation.").

20   Because there are issues of material fact precluding summary judgment on the issue of

21   whether plaintiff violated a relevant provision of the WAC, the Court DENIES both parties'

22   motions for summary judgment on the CPA claim.

23                    **iv.  Attorney's Fees and Treble Damages**

24

25   _____

26   [7] The Court declines to consider WAC § 284-30-330(3), which penalizes an insurer for "[f]ailing
     to adopt and implement reasonable standards for the prompt investigation of claims arising under
27   insurance policies," as defendant only cited the provision in passing in support of his failure to
     investigate argument and did not provide any specific analysis as to how plaintiff failed to adopt or
28   implement "reasonable standards." *See* Dkt. # 57 at 21; Dkt. # 70 at 23.

ORDER ON PARTIES' CROSS-MOTIONS
FOR SUMMARY JUDGMENT - 34

1    Because the Court finds that genuine issues of material fact preclude a grant of summary

2    judgment on defendant's IFCA and CPA claims, it may not at this time award attorney's fees or

3    treble damages (both of which are only available for successful claims brought under the CPA

4    or IFCA). *See* RCW § 19.86.090; RCW § 48.30.015(3).

5    Defendant also requests an award of attorney's fees under *Olympic Steamship*. Dkt. # 57

6    at 25. Under the *Olympic Steamship* rule, an "insured party is entitled to attorney fees 'in any

7    legal action where the insurer compels the insured to assume the burden of legal action, to

8    obtain the full benefit of his insurance contract.'" *Nordstrom, Inc. v. Chubb & Son, Inc.*, 54 F.3d

9    1424, 1437 (9th Cir. 1995) (quoting *Olympic Steamship Co. v. Centennial Ins. Co.*, 117 Wn. 2d

10   37, 53 (1991)). "The only articulated limitation to this rule is that no fees are awarded when the

11   insurer does not dispute coverage, but merely disputes the value of the claim." *Id.* This

12   limitation was first recognized in *Dayton v. Farmers Ins. Grp.*, 124 Wn. 2d 277 (1994). In

13   *Dayton*, the insured, Mr. Dayton, had filed an uninsured motorist claim ("UIM") and the

14   insurance company, Farmers Insurance, had accepted liability. 124 Wn. 2d at 279. However, the

15   parties "were unable to agree on the value of the UIM claim." *Id.* The Washington Supreme

16   Court found that the *Olympic Steamship* rule did not properly govern the dispute because "Mr.

17   Dayton has not compelled Farmers to honor its commitment to provide coverage. Instead, this

18   case presents a dispute over the value of the claim presented under the policy." *Id.* at 280.

19   Following *Dayton*, the Washington Supreme Court has clarified that "[c]overage disputes

20   include both cases in which the issue of any coverage is disputed and cases in which 'the extent

21   of the benefit provided by an insurance contract' is at issue." *Leingang v. Pierce Cnty. Med.

22   Bureau, Inc.*, 131 Wn. 2d 133, 147 (1997). Thus, in cases where "the insurer admitted there was

23   some coverage but disputed the scope of the coverage," the *Olympic Steamship* rule applies. *Id.*

24   (citing *McGreevy v. Oregon Mut. Ins. Co.*, 128 Wn. 2d 26, 33 (1995)).

25   Here, TDIC argues that "[t]his dispute is related to the amount of benefits that

26   Defendants are entitled to receive for their covered claim." Dkt. # 115 at 2. The Court agrees.

27   The question, however, is what is meant by "benefits." If the "benefit" is merely the value of the

28   agreed upon covered loss, then the *Dayton* limitation applies, and *Olympic Steamship* is not

ORDER ON PARTIES' CROSS-MOTIONS
FOR SUMMARY JUDGMENT - 35

available. However, if "benefits" means the scope of insurance coverage, then this case is properly a coverage dispute governed by *Olympic Steamship*. The Court finds that the "benefit" at issue is the scope of insurance coverage. Here, TDIC "admitted there was some coverage, but the insured asserted there was a different amount of coverage available under the policy." *Leingang*, 128 Wn. 2d at 146. Specifically, the parties disagree over what is covered under the "tenant improvements" provision of the insurance policy. Because this Court, like the *McGreevy* court, "found in favor of the insured" on the scope of coverage question, it will also award defendant attorney's fees under *Olympic Steamship*. *Id.*

### III.    Conclusion

For all the foregoing reasons, IT IS HEREBY ORDERED that:

1. Defendant's "Unopposed Motion to Supplement the Record on Parties' Cross Motions for Summary Judgment" (Dkt. # 90) is GRANTED.

2. Plaintiff's "Motion to Supplement the Record on Summary Judgment" (Dkt. # 109) is GRANTED. The Court has considered plaintiff's supplemental evidence, as well as defendant's supplemental evidence identified in his response, Dkt. # 112, in ruling on the motions for summary judgment.

3. Defendant's "Motion for Partial Summary Judgment" (Dkt. # 57) is GRANTED IN PART. The Court grants summary judgment to defendant on the scope of coverage under the policy, as well as on defendant's claim that plaintiff acted in bad faith by failing to reasonably investigate defendant's insurance claim.

4. Plaintiff's "Cross-Motion for Partial Summary Judgment" (Dkt. # 67) is DENIED.

5. Defendant's request for attorney's fees under the rule announced in *Olympic Steamship* is GRANTED. Within fourteen (14) days of this Order, defendant must file a motion for attorney's fees specifying the amount requested, and providing the Court with the relevant calculations. Plaintiff will be given seven days to file a response with any objections to the calculated amount. Defendant will be given seven days to file a reply to plaintiff's response.

1

DATED this 21st day of June, 2023.

2

3

4

Robert S. Lasnik
United States District Judge

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

ORDER ON PARTIES' CROSS-MOTIONS
FOR SUMMARY JUDGMENT - 37